UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 3:24-CR-53-KAC-JEM-1 |
| JASON LEE HOLLYFIELD, | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER
### OVERRULING DEFENDANT'S OBJECTIONS

This case is before the Court on (1) United States Magistrate Judge Jill E. McCook's "Report and Recommendation" ("Report") [Doc. 86] regarding Defendant Jason Lee Hollyfield's "Motion to Suppress" [Doc. 57] and (2) Defendant's "Objections" to the Report [Doc. 108]. For the reasons below, the Court overrules Defendant's Objections, accepts and adopts the relevant portions of the Report, and denies Defendant's Motion to Suppress.

**I.  Background**

Sometime during the day on October 14, 2023, law enforcement conducted a controlled purchase of "one ounce" of "methamphetamine" at a "camper" where "Ashley Jones" lived [Doc. 86 at 3-4]. The camper was located "directly behind [a] house" on "Inman Bend Road" in Knoxville, Tennessee and could be "accessed from" the "driveway" of the house [*Id.*]. That evening and into the early hours of October 15, Deputy Malone was "surveill[ing]" the area in an "unmarked police car" from an adjacent street "approximately one hundred yards from" the camper [*Id.*].

"[A]round midnight," Deputy Malone saw a "truck enter the driveway of the house and pull behind the house to the vicinity of" the camper [*Id.* at 4]. The truck's "headlights were not

1

illuminated" [*Id.*]  Deputy Malone "could not see who was driving" the truck or "whether the driver got out" [*Id.*].  The truck left "after three to five minutes" [*Id.*].  In Deputy Malone's training and experience, this was indicative of drug trafficking [*See id.*; *see also* Doc. 70 (Rough Transcript of Audio-Recorded Suppression Hearing) at 10:19-11:10].

Deputy Malone began following the truck [*See* Doc. 83 at 4].  At some point, he "caught up" to it and was close enough to read the license tag and "run [it] through dispatch" [Doc. 70 at 12:14-21].  "From the very first time" Deputy Malone was close enough to the truck for the driver to see that he was driving an unmarked police car, the truck "did not miss a single turn" [*See id.* at 14:24-15:2].  "As soon as" Deputy Malone "got up behind" the truck, it "immediately" turned right onto "Cameron Road" [*Id.* at 12:18-25, 15:1-3].  Then, while Deputy Malone was "still behind" the truck, it traveled "probably a quarter of a mile down the road," and Deputy Malone followed "directly behind" it by twenty (20) to thirty (30) feet [*Id.* at 13:1-5, 48:7-18; Doc. 86 at 15; Doc. 70 at 48:7-18].  Deputy Malone then watched the truck "turn[] left onto Murrell Road," [*see id.* at 13:7-10], a "divided road with double yellow lines," [Doc. 86 at 4].  The truck "cut the corner very, very shallow and was probably five or six feet into the oncoming lane" [*Id.* at 4-5].  The truck "traveled fifty to one hundred feet while in the other lane" [*Id.* at 4-5].  That "constituted" at least two traffic violations under Tennessee law:  (1) "driving left of center" and (2) "failure to exercise due care" [*Id.*].

Within "ten seconds" after turning onto Murrell Road, the truck made "another left" and then "another" "immediately" onto "Dandelion Circle" before quickly "turn[ing] into [the] driveway" of "the first house on the left" [Doc. 70 at 14:13-18, 16:19-22; *see also* Doc. 86 at 5]. In Deputy Malone's experience, that kind of driving is consistent with someone attempting to evade the police [Doc. 70 at 15:9-12].  Around that time, the "dispatcher reported" that the truck

2

Case 3:24-cr-00053-KAC-JEM   Document 142   Filed 02/04/26   Page 2 of 13
PageID #: 620

"belonged to" Defendant Jason Hollyfield [*See* Doc. 86 at 5]. Deputy Malone recognized Defendant's name and recalled that other individuals who had been stopped or arrested by law enforcement had "previously identified" Defendant as their drug supplier [*Id.*].

Deputy Malone performed a traffic stop on the truck in the "driveway" of the home [*Id.*]. Deputy Malone's body camera started recording [*See* Doc. 70-1]. When Deputy Malone approached the truck, Defendant was in the driver's seat and appeared calm [Doc. 86 at 16]. Jewelia Thompson was in the passenger seat [*Id.* at 5]. Deputy Malone told Defendant that "when you [he] turned . . . on Murrell . . . [he was] way over in the oncoming lane" [Doc. 70-1 at 4:21:50-4:22:04]. Defendant did not respond [*Id.* at 4:22:00-05]. Deputy Malone asked Defendant if he "lived" at this house and Defendant replied no, it belonged to a friend [*Id.* at 4:22:06-11]. Deputy Malone then asked for Defendant's "driver's license, insurance, and other paperwork" [Doc. 86 at 6]. Defendant provided his driver's license and "used his cell phone to look for his insurance information" [*Id.* at 7]. Defendant then showed Deputy Malone insurance information that "was for a different vehicle," not the truck [*Id.*].

Deputy Malone asked Defendant if he had ever been "in trouble" [*Id.* at 8]. Defendant stated that he had been in trouble for "drugs" in "Hamblen County" "two years ago" and was currently "on probation" [*Id.*, Doc. 70-1 at 4:24:26-4:25:59]. Around that time, Deputy Malone "was looking up Defendant's driver's license number on his cell phone" to check if "his license was a fake" or had been "revoked" [Doc. 86 at 8]. Thompson then identified herself by name [Doc. 70-1 at 4:25:05-15]. Deputy Malone recalled that Thompson was a passenger during another traffic stop where law enforcement found her with drugs [Doc. 86 at 5]. Defendant then stated that he "didn't realize I [he] swung a little left," to which Deputy Malone responded, "yeah . . . it was way over" [Doc. 70-1 at 4:25:38-45].

3

Around five (5) minutes into the stop, Deputy Malone asked Defendant for consent to search the truck [Doc. 86 at 9]. Defendant declined, stating that there was no reason to search the vehicle [*Id.*]. At that point, Deputy Malone observed Defendant's "demeanor change[] from cooperative to uncooperative" [*See id.*]. Defendant began to use "curse words" and complain about prior experiences with law enforcement [*See id.* at 9-10]. Deputy Malone testified that in his experience, this shift in behavior was "consistent" with someone who has contraband in his vehicle [*See* Doc. 70 at 25:23-26:25]. Deputy Malone "radioed" K-9 Officer Barker [Doc. 86 at 9].

At around seven (7) minutes into the stop, Deputy Malone relayed Defendant's information to the dispatcher to run through NCIC [*See* Doc. 86 at 20; *see also* Doc. 70-1 at 4:29-03-30]. Deputy Malone then obtained information from Thompson. Upon providing Thompson's name to dispatch, Deputy Malone learned that she "could have" outstanding warrants in "Cocke or Jefferson Counties" in Tennessee [Doc. 86 at 11; *see also* Doc. 70-1 at 4:29:42-4:31:36]. Thompson stated that she "got in trouble" six (6) years ago with Defendant in "Hamblen County" and confirmed that she was "caught" a "couple of years ago" with "weed" [Doc. 70-1 at 4:32:08-4:32:59]. A bit later, Deputy Malone asked Defendant where he and Thompson were "coming from;" Defendant did not respond [*Id.* at 4:33:45-52]. Deputy Malone then asked Defendant if they were "coming from Dove Street;" Defendant responded "no" [*Id.* at 4:33:50-4:34:05].

About twelve (12) minutes into the stop, the dispatcher confirmed that Thompson and Defendant were both "clear" in NCIC [Doc. 86 at 12]. At this time, Deputy Malone was still waiting to "write a citation" [*Id.* at 10]. He had "ran out of tickets earlier that day," and another officer was "on her way to bring him a ticket book" [*Id.*]. He testified that he "could not write a citation without a ticket book and that he could not write a citation on his computer" [*Id.* at 10].

The K-9 Officer arrived roughly ten (10) minutes later, around twenty-two (22) minutes into the stop [*Id.* at 20]. The dog alerted on the truck [*Id.* at 21]. Upon searching the truck, law enforcement located (1) "a small bag of a 'white crystal-like substance'" consistent with methamphetamine, (2) a "small bag containing a 'green plant substance' suspected to be marijuana," (3) "a gallon-size Ziplock bag containing white residue," (4) "a digital scale," and (5) "multiple empty baggies" [*Id.* at 14]. Law enforcement searched Defendant and found "three large bags of a crystal substance . . . believed to be methamphetamine" [*Id.*].

A federal grand jury indicted Defendant, Co-Defendant Ashley Jones, and others with conspiring to distribute fifty (50) grams or more of methamphetamine, in violation of 21 U.S.C. § 846, 841(a)(1), and 841(b)(1)(A) [*See* Doc. 3 at 1]. The Indictment further charged Defendant with possessing with intent to distribute methamphetamine on or about October 15, 2023, in violation of 21 U.S.C. § 841(a)(1), and 841(b)(1)(A) [*See id.* at 4-6].

Defendant subsequently filed a "Motion to Suppress" [Doc. 57], seeking to suppress "all evidence obtained from the search of his vehicle and person" on October 15 [Doc. 57 at 1]. In support, he argues that (1) the initial stop was unconstitutional because Deputy Malone had "no reason to stop" Defendant, [*see id.* at 3-4], and (2) Deputy Malone "illegally prolonged the stop while awaiting" the K-9 Officer's "arrival," [*see id.* at 4-5]. The United States opposed, arguing that (1) the initial stop was supported by probable cause and reasonable suspicion and (2) Deputy Malone had "reasonable suspicion" that Defendant was "engaged in illegal drug activity" to extend the stop until the K-9 Officer arrived [Doc. 61 at 4-7].

Judge McCook held a hearing on Defendant's Motion, [*see* Doc. 70], and thereafter issued the Report [Doc. 86]. The Report concluded that Deputy Malone lawfully initiated the traffic stop because he (1) "had probable cause to stop Defendant after observing him commit traffic

5

violations," [*see* Doc. 86 at 22-25], and alternatively (2) had "reasonable suspicion of a drug offense" leading up to the stop, [*see id.* at 25-27]. The Report further concluded that the stop was lawful in duration because Deputy Malone had "reasonable suspicion" that "Defendant was engaged in drug offenses while conducting the activities necessary to a traffic stop" [*Id.* at 22-31].

Defendant objected to both conclusions [*See* Docs. 108, 108-1 at 1-2]. ***First***, Defendant "denies that Deputy Malone offered credible testimony that [Defendant] made an illegal turn onto Murrell" Road because (1) there is no video footage leading up to the stop and (2) Deputy Malone offered "contradictory testimony" regarding the turn [Doc. 108-1 at 6-7]. So, Defendant objects to the Report's conclusion that Deputy Malone had probable cause that Defendant committed a traffic violation justifying the stop [*Id.* at 5-7]. And Defendant objects that Deputy Malone did not have reasonable suspicion of criminal activity either [*Id.* at 1-2]. ***Second***, Defendant objects to the Report's conclusion that the approximately twenty-two (22) minute stop was lawful in duration, arguing that "a run-of-the-mill driving infraction . . . would take no more than a few minutes" to investigate and Defendant was compliant [*See id.* at 1-2, 8-10].

The United States responded to Defendant's objections and raised no objections of its own [Doc. 113]. In response, the United States argued that (1) corroborating evidence supports a finding of probable cause for the initial stop, and alternatively, Deputy Malone had reasonable suspicion of "criminal activity" to justify the initial stop; and (2) reasonable suspicion justified continuing the stop until the K-9 Officer arrived [Doc. 113 at 2-4].

## II. <u>Analysis</u>

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). If a timely objection is made under Section 636(b)(1)(C) and that objection is not

6

Case 3:24-cr-00053-KAC-JEM   Document 142   Filed 02/04/26   Page 6 of 13
PageID #: 624

"frivolous, conclusive[,] or general," *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986), "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which [the] objection is made," 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim P. 59(b)(3) ("district judge must consider de novo any objection to the magistrate judge's recommendation"). However, the Court need not engage in de novo review of undisputed portions of the Report. *See Mira*, 806 F.2d at 637; *see also* 28 U.S.C. § 636(b)(1)(C).

"When reviewing a magistrate judge's credibility determinations on a motion to suppress, the district court may accept or reject the magistrate judge's determinations, while recognizing a magistrate judge is in the better position to assess the credibility of witnesses [s]he sees and hears." *United States v. Johnson*, No. 10-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011); *see also Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002). A magistrate judge's assessment of witness testimony is entitled to deference unless it appears the findings are clearly erroneous or irreconcilably inconsistent with the established record. *See United States v. Raddatz*, 447 U.S. 667, 684 (1980); *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003); *see also United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999).

The Court addresses Defendant's objections temporally, beginning with the initial stop. No objection is availing.

### A. The Initial Stop Was Supported By Probable Cause Of A Traffic Violation.

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. amend IV. "A vehicle stop constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Calvetti*, 836 F.3d 654, 665 (6th Cir. 2016) (internal quotation omitted). A vehicle stop generally comports with the Fourth Amendment when it is supported by "probable cause that an occupant of the [vehicle] has committed a traffic offense," even if the

7

officer stopped the vehicle "for a different reason." *United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (citing *Whren v. United States,* 517 U.S. 806, 811-16 (1996)). "Probable cause 'is not a high bar.'" *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). As relevant here, it requires "only a fair probability" of a traffic violation under the "totality of the circumstances," as viewed through the "common-sense lens of ordinary people." *United States v. Sheckles*, 996 F.3d 330, 337 (6th Cir. 2021) (cleaned up).

Here, Deputy Malone had probable cause to believe Defendant committed a traffic offense, thus justifying the initial stop of the truck. *See Brooks*, 987 F.3d at 599. Tennessee law requires drivers to drive on the right half of the roadway, *see* Tenn. Code Ann. § 55-8-115(a), and to drive "as nearly as practicable entirely within a single lane," *see* Tenn. Code Ann. § 55-8-136. At the suppression hearing, Deputy Malone testified that he observed Defendant make a "shallow" left turn onto Murrell Road, crossing the double yellow lines and driving "five or six feet" into the oncoming lane for "fifty to one hundred feet" [*See* Doc. 86 at 4-5; *see also* Doc. 70 at 13:7-10]. If true, this constitutes at least one traffic violation, and the Report properly concluded that Deputy Malone had probable cause to initiate the traffic stop.

Defendant argues that Deputy Malone's testimony was not credible [*See* Doc. 108-1 at 6]. ***First***, Defendant argues that Deputy Malone offered "contradictory testimony"— "first indicating that he was about a one-quarter of a mile away from" Defendant when Defendant turned onto Murrell Road and "later" testifying that "he was just a few feet" behind Defendant at the time [Doc. 108-1 at 6]. And Defendant argues that Deputy Malone "would not have been in a position to see" Defendant turn onto Murrell Road from "one-quarter of a mile away" [*Id.* at 6-7]. But this mischaracterizes the testimony. Deputy Malone testified that Defendant first turned onto "Cameron Road" and then Deputy Malone followed "behind" Defendant "***probably a quarter of***

8

*a mile down the road*," before Defendant turned onto Murrell [Doc. 70 at 12:23-13:6]. This is not at odds with Deputy Malone's later testimony that he was "directly behind" and twenty (20) or thirty (30) feet from the truck when it turned onto Murrell—a distance from which Deputy Malone could credibly observe the turn [*See id.* at 48:7-18].

**Second**, Defendant argues that the absence of "video" evidence of Deputy Malone's "efforts" leading to the stop shows that Deputy Malone lacks credibility [*See* Doc. 101-1 at 6]. But video evidence is not required to credit Deputy Malone's testimony. In fact, the Report's credibility assessment is entitled to deference under the law because it is not clearly erroneous or inconsistent with the broader record. *See Raddatz*, 447 U.S. at 684; *see also Navarro-Camacho*, 186 F.3d at 705. The record confirms the propriety of crediting Deputy Malone's testimony. Shortly before Defendant turned onto Murrell Road, Deputy Malone had "caught up" to the truck and was close enough to read the license plate number and relay it to dispatch [Doc. 70 at 12:14-21]. He was also close enough to see the truck make two immediate left turns only "ten seconds" after turning on Murell Road [Doc. 86 at 4-5]. Additionally, Defendant did not deny that he made an illegal turn; he simply insists on putting the United State through its constitutional pace, as is his right [*See* Doc. 70-1 at 4:22:00-05; *see e.g.*, Doc. 108-1 at 5 ("Indeed, Mr. Hollyfield was charged with failing to exercise due care")]. Accordingly, the Report properly assessed Deputy Malone credible on these key points establishing probable cause for the initial stop.

### B. Deputy Malone Had Reasonable Suspicion Of Criminal Activity Sufficient To Lawfully Continue The Stop Until The K-9 Officer Arrived.

Next, Defendant challenges the Report's conclusion that the duration of the stop was constitutional [*See* Doc. 108-1 at 7-10]. The permissible duration of a seizure or stop is generally "determined by the seizure's 'mission'"—here, "'to address the traffic violation that warranted the stop and attend to related safety concerns.'" *See United States v. Peake-Wright*, 126 F.4th 432,

9

Case 3:24-cr-00053-KAC-JEM   Document 142   Filed 02/04/26   Page 9 of 13
PageID #: 627

436-37 (6th Cir. 2025) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). An officer may make "ordinary inquiries incident to the traffic stop" without unconstitutionally prolonging the stop. *See Rodriguez*, 575 U.S. at 135 (cleaned up). That includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the [vehicle's] registration and proof of insurance." *See id.* An officer's "[a]uthority" for a stop generally "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Peake-Wright*, 126 F.4th at 437 (quotation and citation omitted).

But an officer may continue a traffic stop "beyond what was reasonably necessary to investigate the original cause for the stop" where he has "independent reasonable suspicion" of criminal activity. *See id.* (quoting *United States v. Williams*, 68 F.4th 304, 309 (6th Cir. 2023)). Reasonable suspicion requires more than a "mere hunch," but it "need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Calvetti*, 836 F.3d 654, 666 (6th Cir. 2016) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The key query is whether law enforcement had "a particularized and objective basis for suspecting" the "person stopped" of criminal activity. *Peake-Wright*, 126 F.4th at 437 (cleaned up).

Courts look to the "totality of the circumstances" to determine whether reasonable suspicion existed. *United States v. Townsend*, 305 F. 3d 537, 542 (6th Cir. 2002). The totality of the circumstances includes "the officer's own observations" at the time and "information" he received from "dispatch[] and fellow officers." *See United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) (citation omitted). The Court also considers "commonsense judgments" and "inferences the officer may draw based on his experience and specialized training." *Id.* (cleaned up). The Court looks at the "entire picture" through an "objective lens, asking whether there was

10

a moderate chance, arising from articulable facts and inferences, that the person stopped was engaged in criminal activity." *Id.* at 374-75.

Here, roughly twenty-two (22) minutes elapsed from the time Deputy Malone stopped Defendant to the time the K-9 Officer arrived [*See* Doc. 86 at 20]. After stopping Defendant, Deputy Malone performed permissible checks incident to the stop, including checking Defendant's license and checking NCIC for outstanding warrants on Defendant and Thompson based on the information they provided. *See Rodriguez*, 575 U.S. at 135. Roughly twelve (12) minutes into the stop, Defendant and Thompson were "clear[ed]" through an NCIC check[Doc. 86 at 11-12]. Even assuming, that Deputy Malone should have reasonably completed the "mission" of the traffic stop by this time,[1] *see Peake-Wright*, 126 F.4th at 436-37, Deputy Malone had reasonable suspicion to extend the stop roughly ten (10) minutes until the K9 Officer arrived.

Start at the beginning of the evening. At around midnight, Deputy Malone watched the truck Defendant was driving approach the vicinity of the "camper" where law enforcement had conducted a controlled purchase of methamphetamine that day [Doc. 86 at 3-4]. The truck's headlights were not illuminated [*Id.* at 4]. The truck stayed for only "three to five minutes," which, in Deputy Malone's experience, is consistent with drug trafficking [*Id.* at 4]. Then, upon learning from dispatch that the truck belonged to "Jason Hollyfield," Deputy Malone recalled that more than one person previously identified Defendant as their drug dealer [*Id.* at 5]. As Deputy Malone followed Defendant—and got close enough for Defendant to see that he was being followed by a police officer—Defendant did not miss a turn [Doc. 70 at 14:24-15:2]. He made multiple turns,

---

[1] At this time, Deputy Malone had not written a traffic citation because he was waiting on a "ticket book" that he needed to write the citation [Doc. 86 at 10, 12].

11

some in quick succession, which in Deputy Malone's experience appeared to be evasive maneuvers [*Id.* at 14:13-18, 15:9-12].

Deputy Malone's observations and conversations with Defendant and Thompson during the stop heightened his suspicion. Defendant revealed that he was "currently on probation" for a drug offense two years ago [Doc. 86 at 8-10]. And when Deputy Malone asked to search the truck, Defendant's demeanor changed, becoming uncooperative [Doc. 86 at 9-10]. In Deputy Malone's experience, this shift in demeanor indicated that contraband was present in the truck [Doc. 70 at 25:25-26:25]. *See United States v. Stepp*, 680 F.3d 651, 666 (6th Cir. 2012) ("noticeable change" in the occupant's behavior when officer asked "relatively basic" questions contributed to reasonable suspicion). As for Defendant's passenger, Thompson, Deputy Malone recalled that during a previous traffic stop, she was found with drugs. Thompson also admitted she was previously "in trouble" with Defendant and had been "caught" with drugs [Doc. 86 at 11-12].

Those factors in the aggregate present "a particularized and objective basis" for Deputy Malone's belief that Defendant was engaged in a drug crime. *See Peake-Wright*, 126 F.4th at 437; *see also United States v. Keeling*, 783 F. App'x 517, 522-23 (6th Cir. 2019) (reasonable suspicion existed where officers observed defendant (1) drive to two different known "drug house[s]," (2) "stay [at each] for approximately twenty minutes," and (3) make an "erratic, abrupt turn" after noticing "the unmarked patrol car," and (4) Defendant had a "criminal history"). Defendant's overall compliance with Deputy Malone's orders is not dispositive. Because the "entire picture" presents at least a "moderate chance" that Defendant was engaged in criminal activity, the Report properly concluded that Deputy Malone had reasonable suspicion to lawfully extend the stop roughly ten (10) minutes until the K-9 Officer arrived. *See McCallister*, 39 F.4th at 374-75; *see*

12

*also United States v. Davis,* 430 F.3d 345, 353 (6th Cir. 2005) (30-to-45-minute traffic stop was reasonable to await K-9 officer based on reasonable suspicion).

### III. Conclusion

For the above reasons, the Court **OVERRULES** Defendant's "Objections" to the Report and Recommendation [Doc. 108], **ADOPTS** the relevant portions of the "Report and Recommendation" [Doc. 86] as set forth herein, and **DENIES** Defendant's "Motion to Suppress" [Doc. 57].

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge